**NOTICE: This opinion is subject to modification resulting from motions for reconsideration under Supreme Court Rule 27, the Court's reconsideration, and editorial revisions by the Reporter of Decisions. The version of the opinion published in the Advance Sheets for the Georgia Reports, designated as the "Final Copy," will replace any prior version on the Court's website and docket. A bound volume of the Georgia Reports will contain the final and official text of the opinion.**

In the Supreme Court of Georgia

Decided: September 19, 2023

S22Y0631, S23Y0279. IN THE MATTER OF ROBERT MALLORY CRAWFORD (two cases).

PER CURIAM.

These disciplinary matters are before the Court seeking the disbarment of former Superior Court Judge Robert Mallory "Mack" Crawford (State Bar No. 194192), who has been a member of the Bar since 1987. Both of these matters arise from an incident in which Crawford obtained funds from the registry of the court on which he served as a judge, under circumstances that, according to the Bar, demonstrate that he was not entitled to the funds. In Case No. S22Y0631, Crawford is charged with a violation of Rule 8.4 (a) (3) of the Georgia Rules of Professional Conduct ("GRPC"), based on his first-offender *Alford*[1] plea to a misdemeanor count of theft for his

---

[1] *North Carolina v. Alford*, 400 U.S. 25 (91 SCt 160, 27 LE2d 162) (1969).

conduct in obtaining the registry funds. In Case No. S23Y0279, Crawford is charged with having violated the following provisions of the GRPC for his mishandling of client funds and dishonest conduct: Rules 1.5, 1.15 (I) (a), 1.15 (I) (c), 1.15 (I) (d), 1.15 (II) (a), 1.15 (II) (c), and 8.4 (a) (4). As explained more below, we impose a three-year suspension on the basis of Crawford's violation of numerous GRPC in Case No. S23Y0279 and decline to consider the merits of Case No. S22Y0631.

I. *Procedural History*

Crawford was previously the subject of a judicial discipline proceeding, and the allegations in that proceeding regarding Crawford's underlying conduct were largely the same as those at issue here – namely, that Crawford "'impermissibly convert[ed] money from the registry of the Superior Court of Pike County . . . when he ordered the Pike County Clerk via handwritten note to disburse $15,675.62 in funds from the court registry to him via check' and 'then cashed and used a portion of the check for his personal benefit and deposited the remainder of this money in his personal checking account.'" *Inquiry*

2

*Concerning Judge Crawford*, 310 Ga. 403, 404 (851 SE2d 572) (2020). In that matter, we ultimately declined to answer the question of whether clear and convincing evidence supported a finding that Crawford violated the Code of Judicial Conduct because Crawford voluntarily resigned his office.

Following his appointment to oversee the two instant matters, Special Master Adam M. Hames entered an order, with the agreement of the parties, consolidating the two proceedings and setting an evidentiary hearing. The hearing was held and the parties filed motions and briefs, after which the special master issued a report and recommendation. The special master's report addressed and rejected several general legal objections raised by Crawford and provided findings of fact and conclusions of law as to each of these disciplinary matters, ultimately determining that the evidence established that Crawford had committed each of the charged violations of the GRPC except Rule 1.5. The special master then conducted an extensive analysis of the appropriate discipline and recommended that Crawford be disbarred.

In the matter underlying Case No. S23Y0279, Crawford filed exceptions to the special master's report, seeking review from the Bar's Review Board. After the Bar filed a response, the Review Board issued its report and recommendation, in which it agreed with the special master's analysis and conclusions, except the Review Board ultimately concluded that the appropriate discipline was a three-year suspension. Having now undertaken our own review of the record for Case No. S23Y0279, we also conclude that a three-year suspension is the appropriate discipline for that matter. Given that both of these matters arise from the same single course of misconduct, we see no reason to levy additional discipline based on the alleged violation of Rule 8.4 (a) (3) in Case No. S22Y0631 and therefore decline to consider the issues raised by Crawford concerning that matter. See generally *In the Matter of Morris*, 302 Ga. 862, 864 n.3 (809 SE2d 799) (2018) (declining to reach question of whether attorney violated Rule 8.4 (a) (3) because attorney clearly violated a number of other Rules for which disbarment was an appropriate sanction). As a result, the discussion

4

that follows is confined solely to the issues relevant to Case No. S23Y0279.

II. *Special Master's Recitation of the Underlying Facts*

In his report, the special master laid out the underlying facts as follows. In August 2002, Crawford was hired by D.C. and B.W. to answer a summons in a foreclosure action seeking a writ of possession, which concerned a property that was titled to another individual, A.T. Crawford filed a complaint for redemption of a tax deed in the Pike County Superior Court on September 12, 2002. The next day, the court entered an order staying the writ of possession until a hearing could be held on the redemption complaint, but apparently, no hearing was ever held. In connection with the filing of the redemption action, Crawford deposited into the court's registry $15,675.62 on behalf of D.C. and B.W. The $15,675.62 was composed of a $9,675.62 overage collected by the tax commissioner at the tax sale and cash provided by D.C. Although Crawford acknowledged at the hearing before the special master that there was an unresolved issue regarding whether the overage funds belonged to A.T. or D.C., Crawford signed the

5

receipt for the overage funds as A.T.'s "attorney-in-fact," apparently because D.C. presented Crawford with a power of attorney from A.T., although Crawford did not represent A.T.

Crawford did not have a written fee agreement with D.C. or B.W., but he maintained that he had an oral agreement with D.C. to the effect that, if Crawford kept D.C. from being removed from the property during D.C.'s life, Crawford could keep the money in the court's registry as his fee. Crawford rarely had fee agreements with clients and would not get paid until after his work had been completed, if he got paid at all; if, after completion of his work, Crawford and a client could not agree on a fee, Crawford would simply move on and forget about being paid for his work. Crawford was not paid anything for his work for D.C. and in fact paid D.C.'s filing fees. Crawford believed that, had the property been redeemed during D.C.'s life, they would have worked out a fee.

D.C. died in April 2004, and Crawford reached out to D.C.'s brother about the funds in the registry, but D.C.'s brother apparently did not want anything to do with matters concerning D.C. In

6

September 2005, Crawford filed a motion seeking the appointment of a special master in the redemption action and listing B.W. as the executrix of D.C.'s estate. Crawford did not assert an interest in the registry funds as a fee at that time.

In November 2009, a judge of the superior court entered an order dismissing the redemption complaint for want of prosecution and directing the clerk of court to pay the registry funds to the redemption plaintiffs upon their submission to the clerk of the certificate required by then-Rule 19 (now Rule 23) of the Uniform Superior Court Rules ("USCR").[2] Crawford consented to the dismissal order without

---

[2] This Rule provided that "[u]pon any order being presented to a judge requiring the court clerk to pay out funds from the registry of the court, except in garnishment proceedings, counsel for the parties presenting the order shall at the same time submit to the court" a certificate formatted as follows:

I hereby certify that the order presented in case no. ____ on this the _____ day of _____, 20__, to draw down funds from the registry of court, is done with written consent of all parties, or their counsel, who have filed claims of record in this case, and whose interest has not previously been foreclosed by judicial decree. In condemnation matters only, I further certify that provision is made in this order for the payment of all local, state and federal government taxes, or assessments of record.

7

speaking with B.W. and, again, did not assert at that time that he was owed any of the registry funds as a fee.

The clerk of the superior court, Linda Williams, initially attempted to send the registry funds to B.W. or to someone on D.C.'s behalf, as she believed that the funds belonged to them, but she was apparently unable to find them. In 2017, Williams spoke to Crawford, who was by then a judge on the superior court, about what to do with the registry funds. The special master recounted that Williams initially testified that, although she was not sure, she thought it had been her idea to give the funds to Crawford. However, when Williams was presented with testimony that she had given in connection with the Judicial Qualifications Commission ("JQC") proceeding to the effect that it had been Crawford's idea to give him the money, she acknowledged that her prior statement had been truthful but stated

---

I understand that the truth of the statements contained in this certificate is a condition precedent to the issuance of a valid order to pay the funds from the registry of the court.

Date _____

Signed _____

Attorney for _____

8

that she simply did not remember at the time of these proceedings the particular details of her testimony in connection with the JQC matter.[3] In any event, Williams stated that Crawford had not ordered her to give him the funds. Williams considered sending the registry funds to the Department of Revenue as unclaimed, and Crawford asked her, if she were to do so, to list him as a claimant. Williams stated that this was the first time that she could recall Crawford telling her that he was entitled to any of the registry funds.

On December 11, 2017, Williams issued to Crawford a check for the full amount of the registry funds. Of those funds, $10,000 was deposited into Crawford's personal bank account, which was, at that time, overdrawn by $2,232.21. Crawford took the remaining $5,675.62, and he admitted at the hearing before the special master that he used that money for personal purposes. Thereafter, Crawford was contacted

---

[3] The special master stated that he did not find Williams's testimony to be "particularly helpful," as it appeared clear to him that she did not wish to harm Crawford, with whom she had apparently been friends for more than 30 years. The special master "did not get the impression that Ms. Williams was attempting to be deceitful," instead stating that "a passage of time, personal tragedy, and a desire not to hurt a friend created gaps and shade in her memory."

about the matter by the JQC, and, as a result of that conversation, he raised and returned the money in February 2018. The special master noted that Crawford acknowledged at the hearing that, in having the funds removed from the registry, he had not complied with the judge's 2009 order to file a certificate in compliance with the USCR, but he claimed that he had taken money out of the registry without a certificate before, presumably in other cases.[4]

On the same day Crawford received a check for the registry funds, Crawford gave Williams unsigned, handwritten notes to include in the file but not to be stamped in on the docket. Crawford acknowledged at the hearing that he wrote these notes and stated that they were put into the file on the day he received the registry funds for the purpose of establishing a "roadmap" of what had happened to the funds. The notes included a brief procedural history of the redemption case, a recitation of Williams's actions in attempting to contact the case plaintiffs, an acknowledgement of D.C.'s death, and an assertion

---

[4] Crawford also asserted at the hearing that, in his experience, the clerk had a legal right to pay whomever she chose to pay, even in contradiction of a court order, and that this was done "all the time."

that Williams would have paid the funds in 2009. The last two items in the notes stated that: (1) "[t]he funds are being returned to Robert M. Crawford," followed by two words that were crossed out but appeared to the special master to have been "to make"; and (2) "[t]hese notes cannot be filed in the case since the case has been closed for 8 years, they are to be placed in the file but not recorded." The special master pointed out that the notes were not signed, did not include any mention of the funds representing an earned attorney fee for Crawford, and did not otherwise comply with the certification requirement for the withdrawal of funds under what is now USCR 23.

III. *Crawford's General Legal Objections*

In the proceedings before the special master, Crawford raised a number of legal objections that did not concern the specific allegations of his violations of the GRPC, but instead concerned issues regarding the general propriety of the disciplinary proceedings. The first of these issues concerned Crawford's request for a jury trial of this matter. In rejecting this argument, the special master correctly recognized that he was bound to follow the precedent set by this Court in cases such

11

as *In the Matter of Jefferson*, 307 Ga. 50 (834 SE2d 73) (2019), which rejected a similar request for a jury trial. In his exceptions to the special master's report, Crawford argued this issue at length and urged that this Court should reconsider its case law on this point. We decline the invitation to do so.

The next two issues were raised by Crawford in the alternative: (1) whether the Bar, the special master, and this Court lacked subject-matter jurisdiction over this matter because Crawford was a sitting judge at the time of the alleged misconduct and the JQC, which has exclusive jurisdiction over the discipline of judges, had already prosecuted the matter; and (2) whether this matter was barred by res judicata because of the prior JQC proceeding brought against him. As to the question of subject-matter jurisdiction, after reviewing the pertinent law, the respective scope of the jurisdictions of the JQC and the Bar, and the authority of this Court to govern the practice of law in Georgia, the special master determined that there was no subject-matter jurisdiction problem, as the record showed that Crawford claimed that he did not overtly use his position as a judge to commit

the acts constituting the alleged misconduct; that he was, at the time of his misconduct, a member of the Bar as well as a sitting superior court judge; and that he believed that he was acting in his capacity as an attorney in committing the acts at issue. We agree that, even to the extent that the Bar lacks the authority to discipline a judge who is also an attorney for conduct that was clearly committed in his judicial capacity, under the particular facts here, where Crawford's alleged misconduct occurred in his capacity as a private attorney, and not as a judge, there is no basis for concluding that there was a subject-matter jurisdiction problem as to the Bar's attorney disciplinary proceedings here.

With regard to res judicata, the special master recounted that Crawford argued that res judicata applied to preclude the Bar's ability to bring this matter because both the JQC matter and this matter concern the same underlying acts and omissions; the JQC investigated the matter and made a recommendation to this Court; and this Court ruled on that recommendation. After reciting law concerning the

13

application of res judicata,[5] the special master recounted that the JQC complaint alleged violations of the Code of Judicial Conduct, specifically, of Rule 1.1, which requires that judges respect and comply with the law, and Rule 1.3, which requires that judges not use the prestige of their office to advance their private interests or those of others. The special master then concluded that Crawford had failed to establish that there was an identity of the causes of action between this matter and the JQC matter, given that this matter concerns alleged violations of the GRPC, which were not and could not have been before the JQC, and that this matter would require the Bar to offer facts proving numerous allegations that were not at issue in the JQC proceeding, such as that Crawford mishandled client funds as proscribed by the GRPC.

---

[5] As we have previously explained, "the doctrine of res judicata prevents the re-litigation of all claims which have already been adjudicated, or which could have been adjudicated, between identical parties or their privies in identical causes of action," and "three prerequisites must be satisfied before res judicata applies – (1) identity of the cause of action, (2) identity of the parties or their privies, and (3) previous adjudication on the merits by a court of competent jurisdiction." *Rockdale County v. U.S. Enterprises, Inc.*, 312 Ga. 752, 758 (865 SE2d 135) (2021) (cleaned up).

We have not previously addressed the res judicata effect of a prior JQC proceeding on a subsequent attorney discipline proceeding such as this. But we can assume (without deciding) that res judicata applies to a disciplinary proceeding like this one, because we agree that, under these circumstances, res judicata does not bar this disciplinary proceeding. "'Cause of action'" is "'the entire set of facts which give rise to an enforceable claim' . . . with special attention given to the 'wrong' alleged." *Coen v. CDC Software Corp.*, 304 Ga. 105, 112 (816 SE2d 670) (2018) (citation omitted). The special master correctly concluded that there was not an identity of the causes of actions between this matter and the JQC matter because (1) the violations of the Code of Judicial Conduct charged in the JQC matter involved alleged wrongs – specifically, that Crawford failed to respect and comply with the law and that he used the prestige of his office to advance his private interests – that were different from those alleged in this matter; and (2) there were many facts that the Bar was required to prove in this matter that were not required to be proved in the JQC matter. Thus, regardless of whether the Bar and the JQC are

15

privies and whether the resolution of the prior JQC matter constituted an adjudication on the merits, the Bar was not prevented by res judicata from seeking to discipline Crawford.

The special master also addressed Crawford's assertion that this matter was time-barred under Bar Rule 4-222 (b). With regard to that claim, the special master reviewed the record and concluded that this matter complied with Bar Rule 4-222 (b) and thus denied Crawford's motion to dismiss on that basis. Crawford's final objection was styled as an equal protection argument, which the special master determined was a species of a selective prosecution claim. The special master rejected that argument because Crawford failed to develop a factual record in support of such a claim. Crawford did not renew his argument as to either of these final two issues in any of his filings following the issuance of the special master's report, such that they appear to have been abandoned. In any event, we agree with the special master's resolution of these issues.

IV. *Disciplinary Analysis by Special Master and Review Board*

16

The special master began by addressing whether the Bar had adequately demonstrated that Crawford's conduct violated Rule 1.5.[6] In making this determination, the special master first considered the plausibility of Crawford's story that he was entitled to the funds as an earned fee for his work on behalf of D.C. The special master acknowledged Crawford's testimony that he was generally not paid a fee until work was completed for a client, that written fee agreements were uncommon in his practice, and that he would not collect any fee if he and a client could not reach an agreement on a fee. Nevertheless, the special master concluded that no reasonable attorney who believes that he has earned a $15,000 fee would allow that fee to sit in the registry of the court for nearly 14 years without claiming those funds or at least attempting to assert an interest in them.

The special master reasoned that if Crawford had an agreement with D.C. that, if Crawford were able to keep D.C. on the property until D.C. died, the registry funds would be Crawford's as a fee (as

---

[6] Rule 1.5 makes it a violation for a lawyer to "make an agreement for, charge, or collect an unreasonable fee or an unreasonable amount for expenses."

17

Crawford asserted during the hearing before the special master), then the time to claim that fee was upon D.C.'s death. The special master noted, however, that Crawford did not attempt to claim or assert any interest in the funds in 2004 when D.C. died, in 2005 when Crawford filed a motion seeking the appointment of a special master in the redemption action, or in 2009 when a judge of the superior court entered an order dismissing the redemption complaint for want of prosecution and directing the clerk of court to pay the registry funds to the redemption plaintiffs. Instead, at the earliest, Crawford did not assert an interest in the registry funds until 2017, when Williams informed him that she planned to escheat the funds to the Department of Revenue. Nevertheless, the special master concluded that, because there was not sufficient evidence in the record to determine whether, to the extent that the registry funds may have constituted a fee, such a fee was unreasonable, the Bar had failed to demonstrate by clear and convincing evidence that Crawford had violated Rule 1.5.

As to the various alleged violations of Rules 1.15 (I) and (II),[7] the special master stated that they were premised on the facts that Crawford took the funds from the registry, placing them in his

[7] Rule 1.15 (I) (a) provides, in pertinent part, that "[a] lawyer shall hold funds or other property of clients or third persons that are in a lawyer's possession in connection with a representation separate from the lawyer's own funds or other property. Funds shall be kept in one or more separate accounts maintained in an approved institution as defined by Rule 1.15 (III) (c) (1)." Rule 1.15 (I) (c) provides that "[u]pon receiving funds or other property in which a client or third person has an interest, a lawyer shall promptly notify the client or third person. Except as stated in this Rule or otherwise permitted by law or by agreement with the client, a lawyer shall promptly deliver to the client or third person any funds or other property that the client or third person is entitled to receive and, upon request by the client or third person, shall promptly render a full accounting regarding such property." Rule 1.15 (I) (d) provides that "[w]hen in the course of representation a lawyer is in possession of funds or other property in which both the lawyer and a client or third person claim interest, the property shall be kept separate by the lawyer until there is an accounting and severance of their interests. If a dispute arises concerning their respective interests, the portion in dispute shall be kept separate by the lawyer until the dispute is resolved. The lawyer shall promptly distribute all portions of the funds or property as to which the interests are not in dispute." Rule 1.15 (II) (a) provides that "[e]very lawyer who practices law in Georgia, whether said lawyer practices as a sole practitioner, or as a member of a firm, association, or professional corporation, and who receives money or property on behalf of a client or in any other fiduciary capacity, shall maintain or have available one or more trust accounts as required by these Rules. All funds held by a lawyer for a client and all funds held by a lawyer in any other fiduciary capacity shall be deposited in and administered from a trust account." Rule 1.15 (II) (c) requires, in pertinent part, that "[a]ll client's funds shall be placed in either an interest-bearing account at an approved institution with the interest being paid to the client or an interest-bearing (IOLTA) account at an approved institution." The maximum sanction for a single violation of Rules 1.15 (I) (a), 1.15 (I) (c), 1.15 (I) (d), and 1.15 (II) (a) is disbarment. The maximum sanction for a single violation of Rule 1.15 (II) (c) is a public reprimand.

personal account and using them for his personal purposes. Although the special master acknowledged that Crawford asserted that the funds constituted an earned fee, he reiterated his conclusion that the record did not support such an assertion, as the only evidence that Crawford was entitled to the funds was Crawford's own post hoc statement, which was supported by no other evidence. The special master further noted that, even to the extent that Crawford believed that he had a fee agreement with D.C. that may have entitled him to some of the registry funds, Crawford acknowledged that there was uncertainty regarding whether a substantial portion of the funds had even belonged to D.C. in the first place, but that Crawford failed to seek a judicial determination to resolve that question.

The special master thus concluded that clear and convincing evidence showed that Crawford violated Rule 1.15 (I) (a) by failing to hold the funds of his client separate from his own funds in an approved institution; violated Rule 1.15 (I) (c) by failing, upon receipt of the funds from the registry, to notify and promptly deliver those funds to the client; violated Rule 1.15 (I) (d) by keeping funds in which,

arguably, both he and his client had an interest and by failing to keep those funds separate until there had been an accounting; violated Rule 1.15 (II) (a) by failing to hold the funds of his client in a trust account and to administer those funds from that trust account; and violated Rule 1.15 (II) (c) by failing to place his client's funds in an interest-bearing account at an approved institution.

Finally, the special master considered whether Crawford had violated Rule 8.4 (a) (4).[8] The Bar had alleged five bases for such a violation: (1) that Crawford had falsely told Williams that he was entitled to the funds; (2) that he had falsely stated that Williams had urged him to take the funds; (3) that he had acquired the funds without complying with the 2009 superior court order or with the relevant provision of the USCR; (4) that he had used his judicial office to acquire the funds; and (5) that he had acquired the funds without notifying his client or delivering the funds to his client. The special

---

[8] Rule 8.4 (a) (4) provides that "[i]t shall be a violation of the Georgia Rules of Professional Conduct for a lawyer to . . . engage in professional conduct involving dishonesty, fraud, deceit or misrepresentation." The maximum sanction for a single violation of Rule 8.4 (a) (4) is disbarment.

master concluded that the Bar failed to demonstrate that Crawford used his judicial office to obtain the funds, noting that, although there was a "stench around this transaction" and Crawford's position likely helped to enable the transaction, his actions were done as a private attorney and he had not compelled Williams to turn over the funds.

However, the special master concluded that clear and convincing evidence did support the Bar's remaining allegations. The special master found that Crawford used deceit and misrepresentation in telling Williams that he was entitled to the registry funds, as Crawford conceded at the hearing that it was not clear whether he would have been entitled to the $9,675.62 overage from the tax sale, which was made out to A.T., not D.C. The special master noted that Crawford was experiencing financial difficulties at the time he obtained the registry funds and expressly found his explanation denying such difficulties not credible. As to Crawford's representation that Williams had urged him to take the funds, the special master found that Williams's seemingly favorable testimony on this point in these proceedings was undercut by her previous conflicting testimony before the JQC, her

22

failure to give Crawford the funds in 2009 after the superior court's order was entered, and her attempts to find B.W. over the years. The special master determined that Crawford's inclusion in the file of the handwritten notes that Crawford gave to Williams to place in the case file, purportedly for the purpose of establishing a "roadmap" of what had happened to the funds, did not demonstrate good faith on Crawford's part but instead demonstrated that Williams wanted to at least have something in the file showing some attempt to comply with the court's order.

The special master then concluded that Crawford engaged in deceit when he acquired the funds without complying with the superior court's 2009 order or the USCR. Crawford admitted that he did not comply with the certification requirement, and the special master was unmoved by his explanation that he had taken money from the registry before without the required certificate, noting that this was in clear violation of the USCR. The special master further noted that Crawford could not have complied with the relevant rule and removed the funds for himself, as he knew that other people had an

23

arguable claim to at least a substantial portion of the funds. As to the final allegation, regarding Crawford's failure to notify his client, the special master acknowledged that D.C. had died in 2004 and that Crawford maintained that he had been unable to contact B.W., but nevertheless concluded that Crawford knew that others had at least an arguable claim to the funds and that Crawford eschewed seeking a judicial determination on the question of ownership of the funds, which would have allowed for delivery to clients of any funds to which they were entitled, and instead used deceit and misrepresentation to claim the funds for himself.

The special master then undertook the analysis regarding the appropriate level of discipline. The special master considered the ABA Standards for Imposing Lawyer Sanctions (1992), see *In the Matter of Morse*, 266 Ga. 652, 653 (470 SE2d 232) (1996), noting that the ABA Standards require consideration of the ethical duty violated; the lawyer's mental state; the actual or potential injury caused by the lawyer's conduct; and the existence of aggravating and mitigating circumstances. See ABA Standard 3.0. The special master concluded

that Crawford violated a duty to his clients and the legal profession; that he acted knowingly and showed no remorse; and that, although he returned the funds to the registry, the potential injury could have been severe. The special master noted that, under the ABA standards, disbarment is generally appropriate "when a lawyer knowingly converts client property and causes injury or potential injury to a client," ABA Standard 4.11; "engages in any other intentional conduct involving dishonesty, fraud, deceit, or misrepresentation that seriously adversely reflects on the lawyer's fitness to practice," ABA Standard 5.11 (b); or "knowingly violates a court order or rule with the intent to obtain a benefit for the lawyer," ABA Standard 6.21.

In aggravation of discipline, the special master found that the record supported the conclusion that Crawford had a dishonest and selfish motive, see ABA Standard 9.22 (b); that he has refused to acknowledge the wrongful nature of his conduct, see ABA Standard 9.22 (g); that the victims of his conduct – D.C., B.W., and A.T. – were vulnerable, see ABA Standard 9.22 (h); that he has substantial experience with the law, see ABA Standard 9.22 (i), a factor which the

special master found to weigh particularly heavily against Crawford, especially given Crawford's service as a judge, see *In the Matter of Blitch*, 288 Ga. 690, 692 (706 SE2d 461) (2011) (noting that "a judge occupies a unique and crucial position of power, trust and responsibility in our society" and that Blitch's conviction for felony Honest Services Fraud Conspiracy "deal[t] a serious blow to the public's confidence in the legal system and, given his position as a judicial officer, his admitted violation of Rule 8.4 (a) (2) warrant[ed] a severe level of discipline"); and that he broke the law, see ABA Standard 9.22 (k), another factor that the special master found weighed heavily against him.

In mitigation, the special master noted that Crawford had no prior disciplinary history, see ABA Standard 9.32 (a), and that he made a timely, good faith effort to make restitution,[9] see ABA

---

[9] The Bar argued below that the special master improperly credited Crawford's restitution of the registry funds as mitigating evidence, contending that the record showed that restitution was only made after the initiation of the JQC proceedings and at the behest of the JQC. See *In the Matter of Brantley*, 311 Ga. 61, 65 (855 SE2d 625) (2021) (stating that "[t]he fact that [Brantley] has made restitution carries no mitigating weight given that she did so only after the

Standard 9.32 (d). The special master acknowledged that, at the time of the alleged misconduct, Crawford was experiencing financial difficulties, see ABA Standard 9.32 (c) (personal or emotional problems are mitigating), but he concluded that this fact simply provided an explanation for Crawford's conduct but did not mitigate its seriousness. The special master also stated that, in light of Crawford's extensive record of public service, his character or reputation should have been mitigating, see ABA Standard 9.32 (g), but he noted that there was no evidence of Crawford's good character in the record, such that there was no mitigation on that basis.[10]

The special master then considered and rejected three further arguments raised by Crawford, by which Crawford sought to mitigate

initiation of disciplinary proceedings"); *In the Matter of Hunt*, 304 Ga. 635, 641-642 (820 SE2d 716) (2018) (noting that restitution was not mitigating because it had been ordered by a judge and citing ABA Standard 9.4 (a), which provides that forced or compelled restitution is neither aggravating nor mitigating). Because we conclude that a three-year suspension is the appropriate discipline in this matter regardless of whether this mitigating factor was properly credited in Crawford's favor, we pretermit the question in this matter.

[10] The special master further determined that any delay in the disciplinary proceedings did not weigh in Crawford's favor, see ABA Standard 9.32 (j), as any such delay was at least partly attributable to Crawford.

his culpability. As to Crawford's argument that he "has already suffered enough," ABA Standard 9.32 (k) (providing mitigation for the imposition of other penalties or sanctions), the special master noted that, in his criminal case, Crawford received a favorable plea deal, according to which he did not have to report to probation, pay a fine, or perform community service; he was treated as a first offender; and he was able to keep his pension. See also *In the Matter of Levin*, 289 Ga. 170, 175 (709 SE2d 808) (2011) (noting that imposition of a criminal penalty is not mitigating). Although the initiation of the prior JQC proceeding led to Crawford's resignation from the superior court bench, the special master noted that, by resigning, Crawford was able to avoid a final determination from this Court as to whether he impermissibly converted funds and concluded that, in any event, such a proceeding was not the type of sanction contemplated to be mitigating by this standard. See *In the Matter of Tucker*, 295 Ga. 357, 358 (759 SE2d 854) (2014) (concluding that a suspension imposed by a federal bankruptcy court as a result of the same conduct involved in

the disciplinary action does not qualify as a mitigating factor in determining the appropriate discipline).

Next, the special master considered Crawford's argument that, in this Court's prior opinion in the JQC matter, "the Supreme Court has already ruled that there may not be clear and convincing evidence in his actions." We did not make any ruling on the merits in that opinion, but Crawford based this argument on our statement that "[i]t also seems clear that, while the evidence before the Hearing Panel likely was sufficient to support a finding that Crawford violated [Code of Judicial Conduct] Rule 1.1 by impermissibly converting the funds he obtained from the court registry under a preponderance of the evidence standard of proof, and perhaps even under the higher clear and convincing evidence standard, that is a close question; we note that the evidence on that issue certainly was not overwhelming." *Crawford*, 310 Ga. at 405. The special master rejected this argument, noting that the full record of the JQC proceedings was not before him and that he was making his decision based on the record established at these proceedings.

Concerning Crawford's argument that "other attorneys have committed far more heinous crimes and not been disbarred" (as the special master characterized it), the special master acknowledged that Crawford had submitted a "databank" of supporting case authorities, but the special master found those distinguishable, in that Crawford's actions directly concerned his fitness to practice law; only one of the cases Crawford cited involved harm to a client or other party in a legal proceeding, such as Crawford's misappropriation of client funds; and, in most of the cited cases, the attorney had expressed remorse for his actions. Accordingly, the special master recommended that Crawford be disbarred.

Crawford filed a request for review by the Review Board, and the Bar filed its response. The Review Board then issued its report and recommendation. The Review Board first considered the special master's findings of fact and determined that the findings were supported by the record and that Crawford had failed to demonstrate that the findings were clearly erroneous or manifestly in error. The Review Board thus adopted the special master's findings. With regard

to the special master's conclusions of law as to the specific alleged Rules' violations, the Review Board stated, as to each alleged violation, that based on the findings of fact, it agreed with the special master's conclusion that the Rules in question had been violated. In reviewing the special master's conclusion that Rule 1.15 (I) (c) had been violated, the Review Board specifically noted that Crawford had argued that some or all of the funds had been a fee for work for which he had otherwise not been compensated, but the Review Board rejected that argument, determining that, had that been the case, Crawford could have sought declaratory or other relief in a proper court proceeding, rather than simply directing that the funds be turned over to him. The Review Board also agreed with and adopted the special master's analysis regarding the legal duties Crawford violated, Crawford's mental state, the potential or actual injury caused by his misconduct, and the applicable aggravating and mitigating factors. However, the Review Board agreed with Crawford that a lesser sanction was appropriate, and it recommended that Crawford instead receive a three-year suspension of his license to practice law.

V. *Our Review of This Matter*

The resolution of this matter ultimately turns on the answers to two questions: was Crawford entitled to the funds that he obtained from the court registry, based on a fee agreement with a long-deceased client, and, if he was not, what is the proper discipline for his misconduct? As to the first question: if our job were to review the record de novo, some of us might have come to a different conclusion than did the special master. But we have recently reiterated that "because this Court recognizes that the special master is in the best position to determine the witnesses' credibility, it generally defers to the factual findings and credibility determinations made by the special master unless those findings or determinations are clearly erroneous." *In the Matter of Eddings*, 314 Ga. 409, 416 (877 SE2d 248) (2022). See also *Reed v. State*, 291 Ga. 10, 13 (727 SE2d 112) (2012) (noting that, "[i]n Georgia, it is well-settled that the 'clearly erroneous' standard for reviewing findings of fact is equivalent to the highly deferential 'any

32

evidence' test").[11] Here, the special master unquestionably made a finding that Crawford's story regarding his alleged fee agreement with D.C. "does not make sense and is not credible." And we cannot say that this credibility finding was clearly erroneous: it was based on some evidence, most notably the facts that the funds were allowed to sit in the registry of the court for nearly 14 years after D.C.'s death without Crawford attempting to claim or otherwise assert an interest in the funds; that Crawford reached out to D.C.'s brother about the funds in the registry; that Crawford made no attempt to assert an interest in the funds until told by Williams that she intended to escheat them to the State; that his personal bank account was overdrawn at the time Crawford was issued a check for the registry funds; and that the handwritten notes that Crawford gave to Williams to place in the case file did not mention an attorney fee.

---

[11] As we recently explained, there are caveats to this general standard, particularly when our review of the record indicates that the special master's "rendition of the facts was incomplete in significant ways," omitting numerous undisputed, relevant facts. *In the Matter of Tuggle,* Case Nos. S23Y0500 & S23Y0501, slip op. at 8 (decided Sept. 6, 2023). Our review of the record here shows no such defect in the special master's findings, so we apply the general standard.

Moreover, Crawford has not made a meaningful attempt to show that the special master's conclusion was clearly erroneous. Instead, Crawford's arguments have focused on faulting the Bar for failing to introduce any evidence to rebut his story and faulting the special master for refusing to credit his story. As to the former point, although the Bar is required to prove its case by clear and convincing evidence, see Bar Rule 4-221.2 (b), it is difficult to imagine what evidence the Bar could have presented that could have rebutted Crawford's story that he had a purely oral fee agreement that was known only to him and to his long-deceased client; in any event, once the special master made a credibility finding on this point, our question on review in this case became whether the special master's finding was clearly erroneous. With regard to the special master's refusal to credit Crawford's fee-agreement story, the special master expressly acknowledged and considered Crawford's account of what had transpired, and, in declining to credit Crawford's story, made the sort of credibility determination that was within his province as the finder of fact. See generally *Tate v. State*, 264 Ga. 53, 56 (440 SE2d 646)

(1994) (noting that "[t]he trier of fact is not obligated to believe a witness even if the testimony is uncontradicted and may accept or reject any portion of the testimony").

Having reviewed the record and concluded that the special master did not clearly err in finding that Crawford did not have a fee agreement with D.C., such that he was not entitled to the registry funds, the next issue to be addressed in conducting this inquiry is to determine which Bar Rules Crawford has violated. As noted, the special master determined that the Bar had failed to sufficiently establish that Crawford had committed the charged violation of Rule 1.5, and we cannot say under these circumstances that the special master erred in reaching that conclusion. With regard to the alleged violations of Rules 1.15 (I) (a), 1.15 (I) (c), 1.15 (I) (d), 1.15 (II) (a), and 1.15 (II) (c), Crawford did not meaningfully challenge the special master's conclusion that he had violated these Rules, other than by asserting that he was entitled to the registry funds as a result of the purported fee agreement with D.C. We thus agree with the special

master's conclusion that Crawford violated Rules 1.15 (I) (a), 1.15 (I) (c), 1.15 (I) (d), 1.15 (II) (a), and 1.15 (II) (c).

Concerning the alleged violation of Rule 8.4 (a) (4), as noted above, the Bar alleged five separate bases on which this Rule was supposedly violated. We question whether several of those bases are adequately supported by the facts and whether they sufficiently support a violation of this Rule, which, as we have previously held, is aimed at policing "'conduct that is intended or likely to mislead another.'" *In the Matter of Golub*, 313 Ga. 686, 691 (872 SE2d 699) (2022) (citation omitted). Nevertheless, we conclude that the record supports the special master's determination that Crawford violated Rule 8.4 (a) (4) when he falsely told Williams that he was entitled to the registry funds. However, we are still left with the question of the appropriate discipline to be imposed in this matter. Crawford, the Bar, the special master, and the Review Board have collectively cited a legion of cases on this point, but all of those cases are distinguishable on one basis or another. Nevertheless, even though we must assess each case's unique factors on a case-by-case basis, the sanctions

imposed in prior, similar cases can be useful in establishing a baseline against which the facts of the instant matter can be compared. See *In the Matter of Veach*, 310 Ga. 470, 472 (851 SE2d 590) (2020) (noting favorably that a proposed suspension was "within the range of punishments that have been imposed by this Court for similar violations").

In determining the appropriate level of discipline in this matter, we view it to be of particular importance that Crawford has engaged in only a single course of misconduct. We recently concluded in a matter concerning a single course of misconduct involving the misappropriation of client funds for personal use, violations of the provisions of the GRPC governing the use of trust accounts, and a violation of Rule 8.4 (a) (4), that a two-year suspension was the appropriate discipline. See *In the Matter of Morgan*, 303 Ga. 678 (814 SE2d 394) (2018). However, the matter in *Morgan* contained additional mitigating factors not present here and, more importantly, this matter contains additional aggravating factors not present in *Morgan*, namely that Crawford has not acknowledged the wrongful

37

nature of his conduct and that the victims of his misconduct were vulnerable.

Moreover, the special master found that the fact that Crawford broke the law weighed heavily against him as a factor in aggravation of discipline, and, although, as noted above, we have declined to reach the question of whether the alleged violation of Rule 8.4 (a) (3) charged in the matter underlying Case No. S22Y0631 provides an additional basis for discipline, we agree that the unlawful nature of Crawford's conduct is aggravating. These facts suggest that a suspension longer than the two years imposed in *Morgan* is appropriate here, and three years is, generally, the longest suspension that we impose. See ABA Standard 2.3; *In the Matter of Briley-Holmes*, 304 Ga. 199, 207-208 (815 SE2d 59) (2018). See also *In the Matter of Favors*, 283 Ga. 588 (662 SE2d 119) (2008) (imposing a three-year suspension for a single course of misconduct involving the misappropriation of client funds for personal use and an attempt to dishonestly cover up the circumstances of the misconduct). Thus, although the special master recommended that Crawford be disbarred, we have reviewed the record as a whole

and conclude, as the Review Board also concluded, that—in light of the fact that Crawford's violations of the GRPC, while serious, involved only a single course of misconduct—the next-most serious discipline that we generally impose, a three-year suspension, is the appropriate discipline here. Accordingly, we hereby order that Crawford be suspended from the practice of law in this State for three years. Because there are no conditions on Crawford's reinstatement other than the passage of time, there is no need for him to take any action either through the State Bar or through this Court to effectuate his return to the practice of law.  Instead, the suspension arising from this opinion will take effect as of the date this opinion is issued and will expire by its own terms three years later. Crawford is reminded of his duties pursuant to Bar Rule 4-219 (b).

*Three-year suspension. All the Justices concur, except Colvin, J., not participating.*